Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Welcome, Council. Good morning. Good morning. Good morning. Good to have you here. I'll just note very briefly for you the judges. On video, we have Judge Niemeyer, Judge Nguyen, Judge Diaz, Judge Floyd, Judge Packer, Judge Richardson, Judge Qualbaum, Judge Rushing. By telephone, we have Judge Wilkinson, Judge Motts, Judge King, Judge Agee, Judge Keenan, and Judge Harris. And I ask, Council, please don't lose your focus on your argument, but be noted any hands raising or a judge states his or her name, they have a question. If you would stop and listen and direct your attention to that question. With that, all right, we're ready to begin. Yes, Your Honor. Good morning. Good morning, Your Honors. My name is Jamie Lilly for the Federal Government. When Congress created the Title X grant program, it provided that no grant funds shall be used in programs where abortion is a method of family planning. In the final rule, the agency reasonably determined that it could not subsidize referrals of Title X patients for abortion as a method of family planning, and that Title X clinics could not be physically co-located within clinics where abortion was a method of family planning. As the Supreme Court held in rust, those restrictions are reasonable and justified. The agency thoroughly considered the benefits and effects of the final rule and concluded that the significant benefits from the rule, focusing Title X funds on the statute's core mission of preconception family planning services and ensuring that Title X funds are not used in violation of the statute's restrictions, outweigh any of the costs or disadvantages that Baltimore has identified here. As the Ninth Circuit recently held, the agency's consideration of the medical ethics issues, the reliance interests of both Title X patients and existing providers, and the compliance costs associated with the physical separation requirement was considered and thorough. The fact that certain commenters, including Baltimore, disagreed with the agency's conclusions and predictive assessments, is no basis for displacing the agency's judgment. We ask the Court to reverse the entry of the permanent injunction. Judge Thacker, I have a question. Yes, Your Honor. What studies were done by HHS to arrive at the $30,000 estimate for the physical separation? Your Honor, the agency considered the costs associated with complying with the physical separation requirement and arrived using its expertise at a quantitative as well as qualitative assessment of those costs. So HHS used its own expertise? Did it conduct studies to determine that? How did it arrive at that other than to just say $30,000 sounds good? Your Honor, the agency considered the methods in which Title X grantees would need to comply with the physical separation requirement. In doing so, it relied on congressional research service reports identifying how many of the grantees would need to physically separate the Title X clinics from clinics where abortion is provided as a method of family planning, and it evaluated under the multi-factor test in the rule how those clinics would be able to separate their facilities most easily. Does HHS now recognize that that $30,000 estimate was woefully inadequate based on reality of what's happened since the final rule? No, Your Honor. My understanding from HHS is that there has been only limited feedback from grantees who remained in the program about their ability to comply with the physical separation requirement. Did you say grant? I'm sorry. You cut out a second. Apologies. Did you say feedback from grantees that remained part of the program? Exactly, Your Honor. There has been only limited discussion with grantees about the physical separation requirement for those who've remained in the program. Your Honor's question about mathematical certainty with respect to cost estimates is beside the point. There's nothing in the Title X statute or the Administrative Procedure Act that requires the agency to quantify physical separation costs in a particular manner. In fact, the Supreme Court in Michigan v. EPA held that where a statute did require, I see that you have a question, Your Honor. Yeah, I'm sorry. I'm going to another point. Under what standards does HHS measure medical ethics? Under what standards does HHS measure medical ethics? Within the context of the rule, the agency considered the commenter's suggestion that the rule would require providers to violate medical ethics, and the agency reasonably concluded that the statute didn't. Based on what did the agency reasonably conclude that the rule didn't require violation of medical ethics? Medical professional organization. Your Honor, as we pointed out, as the district court and plaintiff has recognized, there's no need to identify a professional organization, but here… That's different from, okay, you're saying no need to identify a professional medical organization, but I guess my question was, is there any medical professional organization that agrees with HHS that this final rule doesn't violate medical ethics? Your Honor, I believe that there were some medical organizations that submitted comments in favor of the rule that we've cited in our opening brief, but, again, that was not required under the APA. Which ones are those? I thought the government conceded at the district court that there were no professional organizations of any kind that take that position. Your Honor, the government did not need to identify a professional medical organization and did not do so. I understand your point that you say, to be reasonable, the government didn't need to identify a medical organization that found this ethical. But is there one? And if so, which one? Your Honor, we have not identified any medical organization that in the comment period attempted to establish the view that must – of Title X providers who've remained in the program that this does not violate – that their participation does not violate medical ethics. Okay, so just to make sure I'm clear, the HHS – there are no medical professional organizations. I know you say you don't need any, but there are none that support the final rule as being medically ethical. No, Your Honor, there's no evidence on which we could draw that conclusion in the record. Well, just a minute. The report, the Federal Register, indicates that the Supreme Court relied on the American Medical Association's view that this was – that the American Medical Association would not bar such a rule. Your Honor, the – The rule versus way. You quoted it – you quoted it right in Federal Register 7748. Yes, Your Honor, the agency did rely on the rationale in Russ v. Sullivan and certainly the conclusion there that the rule did not interfere with the patient-provider relationship, in part because this is a limited, federally-funded program. How is Russ v. Sullivan applicable here when it was decided well before the non-interference mandate and the non-directed mandate? Your Honor, because the question to which Russ was addressing was whether, in the context of the limits of this program, in which the federal government has determined what activities and will not fund, does not create a barrier or does not interfere with a patient-physician relationship. And that maintains – that continues to be the case and there's nothing that plaintiffs have pointed to to suggest that that conclusion has somehow changed. Well, I think they've pointed to every medical organization that has looked at this as saying that this is – that interferes with the patient relationship. Your Honor, no, they haven't pointed to a single medical organization that suggests that in the context of a limited, federally-funded program, the decision not to refer for abortion somehow interferes with the patient-provider relationship. Their views about whether a general practitioner might be required to provide abortion referrals in the context of a more robust patient-provider relationship did not obtain, as the Supreme Court held, in the context of a limited, federally-funded program. This is Judge Wilkinson. Yes, Your Honor. Does this rule rise or fall on which medical organizations do or do not support it on an issue of this kind, where there are deeply held and legitimate views on both sides of it? It would seem to me that both the judgment of the Congress and the statute and the judgment of the agency in the rulemaking process, that you're entitled to take into account not just the views of medical organizations, but the views of the laity and the way in which they feel and express themselves. It may be that someone that doesn't have a medical degree, but still has deeply held religious or moral views on one side or another of this question, that their views should count, too. Yes, Your Honor. There were numerous comments on the question of ethics on both sides of the question, and the agency considered all of those. The point is that the ethical position on this doesn't necessarily rise or fall on the views of medical organizations. People can have an ethical view of something without having a medical degree. Yes, Your Honor. That is entirely true, and particularly where those views are adopted by Congress in the various federal conscience statutes, by states including Maryland, by the views of the states who are charged with regulating medical ethics and the practice of medicine, who have not determined that declining to refer for abortion violates the medical ethics, that the agency is entirely justified in taking those views into account, particularly where... Counsel. Yes, Your Honor. Counsel, this is Judge Quattlebaum. I have a question in follow-up to one of the earlier points about Russ' application. I think the question was in light of the Appropriations Proviso and the Affordable Care Act. I want to ask about the Proviso. Is it your position or your client's position that the language in the Proviso is ambiguous and such that the agency was entitled to interpret it and we are required to defer to that, or is it your position that the language is clear and unambiguous in support of the final rule? Your Honor, with respect to the appropriations rider on the nondirective counseling provision, we believe that that is clear and that's supported by agency practice even in the context of the 2000 regs that Baltimore would prefer where the agency treated nondirective counseling and referrals as distinct activity and adopted restrictions and guidance in accordance with those. We think it's abundantly clear that Congress, in adopting that rider, certainly did not require abortion referrals in the context of the Title X program and that it allowed but did not require nondirective counseling, all of which is permitted under the rule. If Baltimore wants to counsel about abortion as a method of family planning in its Title X programs, it may do so as long as that counseling is nondirective. Judge Williams. Yes, Your Honor. I want to be clear on the ethics answer that you gave in Judge Wilkerson's question. Is it true or is it your position, given the fact that you didn't have commentary from medical experts, Judge Wilkerson alludes to you can have laity and have religious and moral views, are those the views that you use to determine the medical ethics here, the religious and the moral views? Was that your basis for determining ethics here? Your Honor, I want to make sure I understand your question. Were the religious and ethical views of laity. What was the basis for you to determine what the medical ethics was in this case? Judge Wilkerson alluded to the fact that you are not restricted to just looking, I think I'm correct, looking at medical experts. In the legal field, typically when we're looking at a lawyer's ethics, we don't exactly go out and ask other folks about that. I'm wondering if the medical field is different because I guess the morality of this issue is there. And my question is, in looking at Judge Thacker's earlier questions regarding the source of your decision regarding the ethics here, was it the religious or the moral values that you considered in making that decision? Your Honor, the agency relied on three bases. First, for its determination that the rule did not violate medical ethics. The first, that this is a limited, federally funded program. As Russ recognized, it meant that there was no expectation of comprehensive medical advice or no interference with a broad provider-patient relationship. It relied on the many conscience statutes that Congress and the states, through their people, have enacted that permit providers to decline to refer for abortion, which established that those states and Congress do not think that declining to provide for abortion violates medical ethics. And it also relied on the fact that many states have participated, have adopted similar rules, and have participated in programs that decline to refer for abortion as a method of family planning. So those were the principal bases. As experience has borne out, of course, many states continue to participate in the Title X program, without apparent ethical issue, as well as non-state providers. Just to be clear, those are three results of what you have outlined. I'm asking, where did they arise from? It didn't come from medical expert opinion, from what I know. My question is, does it, and it doesn't matter one way or the other, does it arise from the religious and moral view? In all three cases, I mean, it appears even conscious of whatever, does it, it's a question, that's all. It doesn't seem to come from the medical experts, even with the AMA from previous cases. I'm not sure we go back and it's a blanket forever. Your Honor, I'm not sure that I can agree with that statement. In this case, states are charged with regulating medical ethics and licensing medical professionals. The same states have also passed laws that prohibit referral for abortion as a method of family planning and exempt doctors from referring for abortion as a method. So you are relying on the actions of certain states, is that correct? States who are arbiters of medical ethics. How many states did you rely upon? Your Honor, currently there are 28 states that are participating in the Title X program, and plaintiff has identified no states that have ever issued an ethical sanction for declining to bribe for abortion as a method of family planning, particularly in the context of a limited federally funded program. So I think the weight of the evidence supports the agency's conclusion that this does not violate medical ethics. By negative inference, you say? Yes, the lack of violation and the affirmative act of the states and Congress in adopting similar restrictions and exemptions establishes that this does not violate medical ethics, Your Honor. Yes. I believe there was another question. Yes, Your Honor. Judge Floyd, can you change the subject matter a bit? Can you address the issue about nationwide bank return? Yes, Your Honor. Yes, Your Honor. Our position, of course, is that that issue is not properly before the court because there was no cross appeal, but that the plaintiff's position that setting aside a rule under the APA is not only permitted but required in this instance is manifestly incorrect. In fact, it conflicts with the text of the statute, the history of the APA, as well as this court's own pronouncements in Virginia Society for Human Life. This is Judge Harris. I have a question. If I can take you back to Judge Quaddabond's question about the non-directive provision. Yes, Your Honor. I understood your argument to be that in terms of counseling, referrals are not part of counseling, and we should defer to the agency's interpretation that counseling doesn't include referrals. But then I am troubled by the parts of the rulemaking itself that do refer to referrals being included as part of non-directive counseling. So, if you can point me to somewhere in the rulemaking where the agency, or how would I know if I'm reading this rulemaking, which refers several times to referrals as part of non-directive counseling, that the agency actually has adopted the construction of counseling, that referrals are not in fact part of counseling? Well, Your Honor, the referrals for abortion as a method of family planning are certainly not part of counseling, and the main restriction in the rule prohibiting those makes that clear. I understand. Excuse me. As I read the agency's justification for that, it is not because referrals don't count as counseling. It's because they think these restrictions on referrals are non-directive. So, I don't see the agency adopting a construction that referrals don't count as counseling. I see them saying something very different, which is they count, but this is non-directive. Your Honor, the agency has made both points, that throughout the interpretation of this scheme and even in the 2000 regs that plaintiff would prefer, the agency has consistently treated counseling and referrals as distinct acts. It might be distinct acts, but the agency literally says in the context of this particular rulemaking, that referrals should be included as part of non-directive counseling. So, they may be different things, but the agency, unlike the government in this brief, appears to be of the view that referrals are included within non-directive counseling. I don't know how to refer to the opposite construction. No, Your Honor, the referrals, and perhaps you're referring to different referrals, but non-directive counseling is an activity that includes weighing a discussion of options and the risks and benefits associated with options associated with pregnancy, referrals, including referrals for abortion as a method of family planning, can occur later at the end of non-directive counseling, but they are distinct activities, and that is a distinction that the agency has been clear about. Your Honor may be referring to non-directive counseling and counseling about adoption and referrals for adoption that are included in a separate statute and the provision of funds for training for those, but Congress made clear that those can occur at the same time as non-directive counseling, but they are not the same. Yes, Your Honor. No, I'm done. Thank you. Judge Diaz? You're on mute. Judge Diaz, you're on mute. Sorry about that. When you say that, I'm just following up on Judge Harris' question, when you say that counseling excludes referrals and the agency has been clear about that, I think I understand Judge Harris' point to be exactly when was the agency clear about that, because it doesn't appear anywhere in the original rulemaking, I don't think, but rather is a litigation position being taken by the agency post hoc, and if that's true, then what, if any, deference is that entitled to? Your Honor, no, the agency in the 2000 regs and in this rulemaking has made clear that non-directive counseling, including counseling about abortion, is permitted under the rule, not required but permitted, and that referrals for abortion as a method of family planning are excluded. It couldn't be clearer that those two things are distinct. One is prohibited and one is allowed. The text of the appropriations rider is limited to non-directive counseling, and as we made clear in our opening brief before the panel, Congress knows well and has attempted at various times to require or allow counseling and referral, uses those terms separately, and the agency has done so in the rule. It would be strange for the agency to treat those two things as separately, as the same in a rule that prohibits one and allows others, and it didn't do so here. Ms. Jett, your red light is on. Are you finished? Your final words? No, Your Honor, just reserve my remaining time for rebuttal if the court allows. Thank you so much. Thank you, Your Honor. Ms. Jett? Thank you, Your Honor. I want to just check briefly before I get started that everyone can hear me, that our audio is okay. We had a very brief mic check before we started. Okay. Yes, I think you're audible to everyone. Thank you, Your Honor. Good to see you. May it please the court, the court should affirm Judge Bennett's decision vacating and permanently enjoining the final rule in the state of Maryland. We should clarify that vacature as a remedy can't be limited geographically to the parties. The rule is arbitrary and capricious for three reasons. I'd like to go through the three, and then I'd like to talk about each in more detail. The rule is arbitrary and capricious first because HHS vastly underestimated the cost of compliance with its separation requirement by orders of magnitude, over $200 million at least. Second, HHS erroneously believed that there was no evidence in the record that would tend to show that there would be adverse impacts on patients or providers in the program. And based on that erroneous belief, failed to weigh any of that evidence against the rule's supposed benefits. And third, HHS's conclusion about medical ethics is inadequately explained and objectively unreasonable. To turn first to the separation requirement and HHS's errors with respect to calculating compliance costs. HHS made two distinct errors in calculating the cost of compliance with the separation requirement. First, HHS made up a number, $30,000. It doesn't have a basis in evidence. There's no evidence in the record that supports it. The agency has been unable to identify any evidence that supports that number. The only evidence in the record that does exist shows that that number is literally orders of magnitude too low. The largest Title 10 provider in the program said that it was over 20 times too low. HHS discounted all of that evidence and set a low number that it made up out of thin air. That would be like the EPA adopting an amount of Clean Air Act air pollutant at one part per million when industry came to the agency and said 40 parts per million is the only evidence-backed number that's consistent with the public safety. And EPA was like, we'll raise it to two parts per million. It doesn't matter because it wasn't backed by any evidence. Next, HHS demonstrably erred by believing that its own separation requirement, which applied to every Title 10 provider because it bars referrals and counseling about abortion, only applied when abortion services were co-located with Title 10 services at the same site. So they chose a number of 15%. And they have to concede this because they've actually said that this is exactly how they came up with the number. They cite to a CRS report that talks about co-located services as the basis for coming up with the 15% number. It's only if you actually provided abortions at the same site that you did your Title 10 services. That was who they said the separation requirement applies to. But it applied to every provider because every provider. Counsel, this is Judge Wilkinson again. Yes, Your Honor. I'm wondering, in deciding the permissibility of this rule, whether we need to go back to the purpose of the statute. Isn't it important in looking at Section 1008 that the only medical procedure referred to is that of abortion? And the statute, for example, doesn't have any comparable bar to federal funding of any other medical procedure. It doesn't bar federal funds for an appendectomy. And in light of the fact that abortion is the only medical procedure referred to in Section 1008, doesn't the very purpose of that statute, hasn't it got to be preparation of funding abortion to the greatest possible extent that they don't want subsidization? I'm just going back to the purpose of it and the fact that what else could Congress have had in mind? And that, it seems to me, bears on the permissibility of this rule because it has to be taken in light of the overall purpose here. What other purpose could Congress have had in mind other than separation of taxpayer funding and abortion procedures? Thank you, Judge Wilkinson. I actually want to address that question and I also want to address your question to opposing counsel earlier. I do not deny that abortion is one of the most fraught issues in American public life and that in passing statutes, Congress strikes very fine balances to try to ensure that there's adequate access to reproductive health care in this case and preservation of important countervailing public values, on the other hand. But I think in Russ v. Sullivan, the Supreme Court said that the statute is ambiguous on this question, maybe on purpose, maybe accidentally, but it says that it's not clear whether the restriction bars you from simply providing abortions with Title X money or whether it's far, far broader. Baltimore doesn't provide any abortions in its Title X at any of the sites. It doesn't do it in its health care clinics. It only refers out and it only counsels when that's part of the diagnostic treatment that's called for for a patient. But the rule has severely impinged on the health care system of Baltimore and on the consciences, honestly, of the doctors in Baltimore's health care system because they believe that they are denying their patients necessary referrals for medical care. So the question of the purpose of the statute is not so clear. We actually think that it's best read as not barring anything but abortion services at the Title X program. But HHS went far broader here and that in Russ v. Sullivan, the Supreme Court said no title to do it. Just a minute. You know, your comment there is a little troubling because the statute doesn't refer to abortion services. It refers to abortion as a method of family planning. Any program, they're not funding any program where abortion is a method of family planning. So that's a public determination as to what they're going to fund or not fund. It doesn't prohibit anybody from providing a service or referral. It's just limiting the grant money so that it doesn't fund programs where abortion is part of the family planning. It seems to me that's a fairly restricted area and most of the issues you talk about are addressed at a level as if the federal government is prohibiting cities and states from doing these things. And really what they're doing is simply limiting funding as a matter of policy, federal policy and state policy, to programs that do not involve abortion as a method of family planning. Well, Your Honor, and I want to, thank you Judge Nemar, I want to key in on method of family planning. Because that's key. I mean, the question of what, whether abortion is a method of family planning, when in Baltimore we only provide an abortion referral on request, whether we consider it a method of family planning is just not true. When we refer at a patient's request we're not endorsing abortion as a method of family planning. The rule is prophylaxis. It's prophylaxis on prophylaxis. It goes far beyond what the statute requires. Now it's ambiguous, or it was in 2001. We think the non-directive mandate and non-interference mandate make it no longer ambiguous because Congress restricted the scope of the agency's authority. But to the degree it was ambiguous in Russ versus Sullivan, we don't endorse abortion as a method of family planning in Baltimore. And so when you make a referral you're not doing that. I'd like to return to Judge Wilkinson's questions because the real problem with the separation requirement, Judge Wilkinson, is that they miscalculated the costs. And it's the Administrative Procedure Act they violated by miscalculating the costs. This returns me to the broader question about Russ versus Sullivan. Russ versus Sullivan, they opened their reply brief. The government opened its reply brief by saying... This is Judge Wilkinson again. I want to follow up on something that Judge Niemeyer said and just address what underlies my concern in this whole area. The Congress here is not brutal here. Neither Congress nor the rule is trying to prohibit anyone from exercising their right to reproductive choice. That's one side of a very fraught debate in which I think both sides have legitimate points to make. But Congress is not trying to step on the right in Roe v. Wade or bar someone from doing this. What it does want to do is to bar federal funding and subsidies because when you go from the right itself to requiring taxpayers to fund the right, that is a moral and ethical and religious step. It's a leap of immense proportions. And what bothers me on a broader scale is the grand compromise in this whole fraught area of abortion is over federal funding. And the compromise is simply this. Individuals do get to exercise what the Supreme Court has indicated was a fundamental right, but taxpayers also have a right here not to fund something that is basically objectionable on so many levels. And so if we're taking what this compromise is and we're invalidating it and cutting the ground out from under this compromise, I worry that we're destroying the whole center in this abortion debate and one of the areas where the legitimate concerns of the respective sides can be negotiated and reach a kind of an uneasy pace. But if we destroy this compromise in federal funding, we're destroying the center in this whole debate and we're leaving only the absolutes, only the absolute positions. And that, from a broader perspective, is what troubles me because there are so many people that are saying, well, I understand that people have the right, exercise the right that the Supreme Court laid out in Roe v. Wade, but I understand, too, that no one should have to have their taxpayer dollars funded. And to destroy that whole spirit of compromise, which I worry that invalidating this rule would do, we are cutting out the middle ground from this debate and the debate needs a little middle ground, not just the clash of absolutes. That's my problem. Judge Wilkinson, let me give you two answers to that question. Let me first say that the administration before Barack Obama didn't think that this rule was necessary. There were three presidential administrations, Clinton, Bush, Obama, that didn't think that this was tipping the compromise, the great American compromise about the legitimate scope of publicly funded abortion programs. There has been a bipartisan consensus. I would point you, we talk about how George H.W. Bush sponsored the bill and President Nixon called for its enactment. This program was always seen as a permissible balancing and it was the 1988 rule and now this rule that actually are jarring changes to the program as it was always understood. And the second point is that we all here are lawyers in the courts and so the question ultimately is we have to be guided by the reasoned decision-making rules of the Administrative Procedure Act and I know you've talked a lot about humility in the law. You know, currently our politics, it's the question of how the equilibrium will be sort of met in the future is in flux. But here our question is far narrower. Our question is did the agency underestimate the cost of the rule by hundreds of millions of dollars? Did the agency... Yes, Judge Becker, I apologize. I want to go back to the point you were just on. I don't see how this is a compromise when the final rule only directs a pregnant woman toward one thing and that is prenatal care. That's the only requirement. If a patient says to her doctor, a pregnant patient says to her doctor, I'd like an abortion referral, they are directed to send her to prenatal care. They are not required to do any other thing including responding with a referral that she can go to. How is that a compromise? Your Honor, we do think that the rule is heavy-handed and overreaching. I mean, we say that it's a gross intrusion on the doctor-patient relationship and we don't walk away from what we said in our briefs. This particular rule really destabilizes any sort of view of there being a compromise. This rule forces doctors to give prenatal referrals even to patients who say, I don't want a prenatal referral. And it bars them from giving abortion referrals even if a patient is pleading with them to provide one. It is placing the government in the doctor's office, in the room, and it's dictating a speech that the doctor has to give to the patient. And the stylized examples of how easy it would be to disclaim the referral restrictions are, they blink reality. Imagine that interaction at the end. Counselor? Yes, Judge Reshing. Judge Reshing. You talk about the speech that the doctor can give. I thought HHS suggested that part of what is permissible to say is that this is a preconception program. And once a patient is pregnant, the patient is sent somewhere else. Why does that not address this sort of balancing two sides concern? Your Honor, when a patient is diagnosed as pregnant, the correct transfer of care protocol, if you weren't going to engage in pregnancy counseling, would be to refer them to nondirected pregnancy counseling, not to make a prenatal care referral as the rule requires. So the problem is that then the rule says, okay, well, you can engage in pregnancy counseling, but it can't be truly nondirected. Because at the end of the session, if the patient concludes that abortion is the right option for her and says, I'd like to pursue an abortion, then you are required to say, I can't give that to you outside the scope of this program. But the follow-up question that would come from the patient is obvious. Why? What do you mean? The doctor can't then disclaim that they don't agree with the government's view. That would be promotion of abortion. They're sort of in this very terrible, really difficult position where the patient is asking them for something, they have one thing that they're allowed to say, and if they say anything to try and extricate themselves from the value judgment it embeds, they're violating the regulation. So that, to us, we think is really the core of the ethical problem, what happens between the patient and the provider in these counseling interactions. Counsel, this is Judge Agee. I have a different question which goes to the remedy in this case, which I understand is a statewide injunction. So the state of Maryland was a plaintiff in the Ninth Circuit case and lost. And here, as I understand it, the only plaintiff is the city of Baltimore. So I'm at a loss to understand the basis for an injunction that would include the entire state, from Frostburg to Ocean City. What's the basis to go beyond the city of Baltimore? Your Honor, the basis is that the withdrawal of providers from the Title X program in surrounding areas, including the rest of Maryland and surrounding states, harms Baltimore. In the exercise of his discretion, Judge Bennett thought that extending the geographic scope to the state of Maryland would appropriately balance the equities in this case. And so that's why he exercised that discretion. We thought that a broader injunction that's not based on the state lines would be a more appropriate injunction. Well, what's the balance of equities that he considered to impose a statewide injunction? Well, Your Honor, we put in evidence in the record that the rule destroys patient trust in the healthcare system broadly. So wherever there are providers who are, just the existence of the rule and providers who are implementing it, are harming Baltimore's healthcare system to the degree that they co-rely on Baltimore's services. Patients from surrounding areas do use Baltimore's healthcare system. Yes, Judge Stepper?  I did have the same question about what is the evidence in the record for this to be a statewide injunction? Where are there JA sites? Where can I find that? Yes, Your Honor, and I know you asked that at the last argument as well. And I would point you to the Declaration of Charlotte Hager and the Declaration of Cynthia Mobley. Those are our best citations. I apologize, I don't have the pages right at hand. We footnote some of their key statements saying that it destroys patient trust and that the withdrawal of providers in surrounding communities will raise the cost of services in Baltimore. I want to point out, though, that because- Counsel. Yes, Judge? Counsel, if I could follow up on the question I asked to your colleague with regard to the appropriations proviso, and I understand your position on that generally, but is it your position that that language is clear and unambiguous in support of your position, or is it your position that it's ambiguous and could be read both ways? Well, Your Honor, we think it's unambiguous in our favor based on text, context, history, use of the term in the rule itself, use of the term- Thank you, I'm sorry to interrupt. We have both sides saying it's clear and unambiguous in support of their position. Does that not lead- and each side supports language and statutes and the way it's been interpreted in support of that view. Does that not give some indication that it in fact may be ambiguous and that the agency is entitled to interpret it, and when it does so, reasonably, and I know you object to that reasonably, but to interpret it reasonably, and if it does, we should defer to it. So let me give two answers, because I think you'll be more interested in one of them than the other. The first is that the agency simply didn't actually engage in any interpretation of the non-directive mandate in the rule. Judge Harris is absolutely right. Try and find it in the rulemaking. You won't find the agency doing any kind of careful statutory analysis as required by Ensino-Monacar to determine that counseling doesn't include referrals. This sort of idea that there was an obvious categorical distinction drawn reasonably by the agency doesn't exist in the preamble. So I think you'll be more interested in that, but my second point is really that it really is unambiguous for two reasons. First, referrals happen exclusively during counseling because a referral is advice about where to go for further treatment. You tell the patient information when you give a referral. So it's both a type of counseling, and it arises solely during or incident to counseling. So we think that because the dictionaries are with us, and because, honestly, the consensus view of the medical community is with us, and because the agency's own view was with us until very, very recently, we think, and so you might be wondering to yourself, why then do they say counseling and referral upon request? Well, one of the big reasons is because upon request is a restriction. So you have to say it separately. I mean, it's not counseling and you can just give referrals. It's counseling and referral upon request. So they kind of had to break it out to talk about when you could do that type of counseling. And the other thing is it's as reasonable to break out referral and counseling as it is to say, you know, referrals during counseling or as to say, like, provision of adoption information during counseling. It's just part of the information provided during the counseling session, a type of information. Here, a referral for further treatment. So that's why we think it's unambiguous, and I hope that answers your question. I want to speak to Judge Wilkinson's question to opposing counsel about medical ethics because I think it really is important. The issue about medical ethics is that the agency came to a conclusion about medical ethics, not the fraught overall ethical view that is all over the map, but about what the consensus view of what medical ethics requires. And they concede that they didn't base their conclusion about medical ethics on the views of any professional medical organization. They concede that they didn't base it on any recognized code of medical ethics. They didn't base it on the view of a medical ethicist. They did not even base it on the view of any individual physician. They didn't cite to a single individual physician. They based it entirely on two, not three, two deductions from legal sources that don't actually give evidence about the requirements of medical ethics. First, they said that Russ versus Sullivan had a holding on this question, that Russ versus Sullivan held that the rule was consistent with medical ethics. But it doesn't have a holding on that question. I've read Russ now many times. I just read it again last night. It says that the impingement, so recognizes there's an impingement on the physician-provider relationship. It says that the impingement on that relationship is not so significant as to give rise to a First Amendment violation. But it can still impinge enough to violate the medical ethics duties of a physician just because it doesn't amount to a First Amendment violation doesn't mean it doesn't violate medical ethics. So that's an unwarranted influence. I want to make one point here with respect to the medical ethics. And that is, of course, the medical ethics are important. And I wouldn't say that they're not. But what I worry about is that we would focus exclusively on the medical ethics point and have the entire case rise and fall on that. Because I think the medical ethics are a very important part of the case. But we're also dealing with democratically accountable bodies. Congress is taking into account a far broader spectrum of opinion than simply medical opinion. And the agency which is acting in response and under a congressional mandate is also entitled, it seems to me, to take into account medical ethics. Yes, that's part of the question. But it too is in a democratically accountable body and responding to a democratically passed statute. And so I think the broader picture is one in which the laity is entitled to weigh in, and especially because it's a matter of federal funding and every taxpayer and every citizen would have an interest in where those funds would go. So yes, medical ethics is important. I don't think we can look exclusively at that to resolve this case. Wouldn't you agree? Your Honor, I would agree. And Judge Bennett said something similar below. But what he pointed out was that the agency can make value judgments, but it can't have the wrong view of the facts. And the problem was that they came to a conclusion about what medical ethics requires. And when you sort of have bad inputs to a very fraught balancing test, then you taint that balancing. This was a problem I didn't, I have only a minute left, but I didn't get a chance to even talk about the fact that the agency failed to consider all of the evidence put into the record about the devastating impacts this would have on providers in the program. Two pages were spent on a poll about positions of confidence. Counsel, counsel, this is Judge Harris. I'm sorry, just before you leave the ethics point, I would very much like it if you would finish what you were saying. You said that the agency relied on two things. Their reading of Ross, and then you didn't get to the second thing, which I am guessing is what you heard from your colleague today, which is the agency said, look, if this violated medical ethics, then state licensing boards would be pulling the licenses of the doctors who remain in the program, and we don't see that happening. So what is your response to that second cluster of results on which the agency relied? Yes, Judge Harris, and I hope the Corps will indulge me and let me go a little bit over time to answer this question. The agency actually relied on the existence of conscience statutes, not that licenses weren't being pulled because the rule wasn't yet in effect. So the licenses being pulled is actually post hoc argument by appellate counsel. I want to get to it, so let me just address it, because conscience statutes, I'll just say, just because you authorize school prayer doesn't mean you can mandate it. So the conscience statutes just don't provide a reasonable inference. I don't want to get into the details, but let me move to this question about licensing. Providers in the program have adapted to this new rule in a variety of ways. Many have ceased engaging in pregnancy counseling of any kind to avoid the rule's ethical restrictions. They've incurred enormous costs. Some of them have made the hotsense choice to stay in, and we just haven't seen an enforcement action yet from a state medical licensing board. But more importantly, medical ethics doesn't turn on what state licensing boards enforce. Medical ethics are the basic values that animate the medical profession, and the AMA has an ethics opinion that says a doctor may never put the interest of a third-party payer above the patient's interests, no matter how it's funded. So there are, like, clear ethical rules, but that doesn't necessarily mean that you're going to see an enforcement action in every case. And I'm over time, so I'll just end it there. Thank you very much, Your Honor. We urge you to affirm but clarify Baker's scope. Thank you, Mr. Chairman. Ms. Lilley? I think you're on mute. You're mute. You're mute. Thank you, Your Honor, for that clarification. I hope you can hear me now. Yes, we can. Okay, great. Your Honor, there's nothing in the Administrative Procedure Act or the Title X statute that suggests mathematical precision about costs, particular views of medical ethics, or of existing grantees can upend the agency's determination that the benefits associated with reading the statute this way, including greater fidelity to the separation that Congress mandated and a focus of Title X funds on its core mission, render this rule irrational, as the Ninth Circuit recently held. I'm going to pause for a moment to respond to Judge Quattlebaum's question about the non-directive counseling rider. It is not only unclear, but it's certainly not clear as a matter of text that an appropriations rider that prohibited the use of funds for abortion and allows non-directive counseling clearly and unambiguously imposes the requirement that all Title X clinics must refer for abortion. The 2000 regs did not read the appropriation rider that way because it's simply not plausible as a matter of textual reading. So Baltimore's reading that it unambiguously requires every Title X clinic to refer for abortion is just simply not the case as a matter of textual reading. Ms. Lilly, can I ask you a question? Yes, Your Honor. This is a question not to zing anybody either side, just to try to parse this out and see how do we come to the reasoning of it. Yes. Would you agree that if the object is family planning, prenatal care is no more part of family planning than abortion is? Do you agree? Exactly, Your Honor. And that was the judgment. Yes. So you would agree then that if you have perfect separation, perfect separation, then you really should be directing them in a counseling or referral context once you're pregnant because, for example, the way we work, these clinics represent sometimes the sole basis for health care for many of these poor women. So if they're being followed along for good gynecological health care and once an examination occurs and the gynecologist says, ma'am, you're pregnant. So for a perfect world of separation, that would be the end, right, for the grantee. Yes, Your Honor. She wouldn't go to the other side at all, correct? Yes, Your Honor. And that's what the rule requires. The reason there is a prenatal care referral requirement is the same reason that there is a requirement that a patient who presents with a need for emergency medical care, including a need for an emergency abortion, are required to be referred for those services. And that is that there is a medical necessity for a prenatal referral when a client presents as pregnant with an emergency medical need for an abortion. And both of those referrals are required by virtue of medical need arising from the patient's condition, not because of the scope of the program. The limitations on referrals for abortion as a method of family planning come from Congress's command that that is not part of Title X program and Title X funds cannot be used to subsidize abortion as a method of family planning. So I appreciate the opportunity to clarify those two very different restrictions. It brings me to a related question that Judge Backer asked about, and that is that the prenatal referral requirement is somehow directive or part of the pregnancy counseling. And any confusion about that when a Title X provider like Baltimore chooses to engage in pregnancy counseling can then clarify and should clarify if there is any confusion on the part of a patient that this prenatal referral requirement is for needs that can be served outside of the program, but does not direct the patient to do anything with respect to the decision about the pregnancy. Yes, Your Honor. Would you agree then that a grantee could have a urologist in the program to discuss disectomy? I don't know whether the Title X funding permits discussion of disectomy. It may very well be. I'm not sure how the rule counsels that. But if the disectomies were covered by the Title X program. Why wouldn't they be covered? First of all, this came about in the 70s. Basically, wasn't it a way to try to reduce poor people having children a little bit? So they can plan their families to decrease the size. Didn't it come out of the administration for the 70s as a response to a little bit? The legislative history indicates that Congress adopted Title X in order to increase the access of low-income patients to certain family planning services. Yes, Your Honor. And wouldn't disectomy be a part of that? You have a husband and wife come there and they say, wait, this is your fifth child. You should consider disectomy. Why is that not family planning? Plausibly, Your Honor. Yes. I just can't think. Plausibly? Your Honor. Why shouldn't the man be a part of this process, too? Title X serves. Excuse me, counsel. It takes two to tango and all of this stuff, right? So why would that be a part of family planning to sit down and say you should consider disectomy? Because your wife has had five children in the fifth pregnancy. It was a very rough postpartum for her. The psychological situation, there's dangers and risks. Why wouldn't that be a part of family planning? Your Honor. The government wants to have everything. You want to direct where you can't go, but you really don't want to have a fulsome view of the ethical medical questions that come with all of this in family planning. Your Honor, my only answer is that I don't know about Title X coverage of any particular procedure, but it stands to reason that if disectomy is considered a part of family planning, that that could plausibly be part of the Title X program. I just can't speak to the facts on the ground because I don't know the answer to that. But, yes, Your Honor, Title X serves men, women, couples, anyone who is in need of Title X services on a sliding scale in terms of the ability to pay. So I'm sorry that I can't answer specifically questions about a particular procedure, but I'm happy to engage in the proposition. What do you do? You cover IUD, condoms, diaphragms, abstinence, cortis interruptus. What did you do? Rhythm? It's about family planning. Yes, Your Honor. Do you give them techniques to prevent pregnancy or to control when you do get pregnant? Yes, Your Honor. The mission of Title X is to provide a broad range of family planning methods. And so many of the things that you've discussed are likely part of the services in any particular Title X funded clinic. So the essence of the service is providing knowledge, isn't it? Yes, Your Honor. It can be distribution of particular methods. Part of it is to make sure that the knowledge is not cut off just because you're poor. Exactly, Your Honor. Of a broad spectrum of things. That's what you're trying to do, right? Exactly, that your preconception family planning methods are covered by the Title X family planning program. But pregnancy counseling is certainly outside of the core mission, and the use of Title X funds for services beyond that mission. Your Honor, plaintiffs have focused on a particular estimate of cost. I want to remind the court that nothing in Title X and nothing in the APA required the agency to quantify with precision any particular cost. And the agency considered the types of costs that plaintiffs identified. It rejected plaintiffs' pessimistic cost predictions as inconsistent with how the rule would be implemented. And there's no basis for invalidating the rule on the basis of any of plaintiffs' objections, and certainly not invalidating anything beyond the physical separation requirement to the cost objections are aimed. Baltimore complains that it prefers or it's best reading of Section 1008 would require all Title X clinics to refer for abortion as a method of family planning, and that may be. But the Supreme Court has held that it is reasonable for the agency to determine that Section 1008 and that the agency's best reading of 1008 prohibits those activities, and that the agency is reasonable in determining that the advantages of that approach outweigh any of the costs that plaintiffs have identified. Your Honor, there was a question about the justification for statewide release to redress Baltimore's injuries as a Title X provider in a limited geographic area, and I would point out that the consequences of that are that Title X providers that remain in the program in Maryland are now when they have not complained of those compliance with the regulation and may indeed prefer them. And for those reasons, Your Honor, we ask that this court reverse the entry of the permanent injunction. Thank you, Ms. Millick, and thank you, Mr. Tutte, as well, for your argument. You know, we have to, apart from our normal tradition in the Fourth Circuit of shaking your hand, but please know that our gratitude and heartfelt thanks is just as real and strong, and we appreciate your argument. Be safe and stay well, and thank you so much. And last time, Mr. Coleman, I didn't give you the right cue. It was my fault, but I will do it this time. Will the clerk please adjourn the court? Thank you, Your Honors. The court stands adjourned.
judges: Gregory,Wilkinson, Niemeyer, Motz, King, Agee, Keenan, Wynn, Diaz, Floyd, Thacker, Harris, Richardson, Quattlebaum, Rushing